# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| GERALD A. LECHLITER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 7939-VCG |
| | ) |
| DELAWARE DEPARTMENT OF | ) |
| NATURAL RESOURCES & | ) |
| ENVIRONMENTAL CONTROL, | ) |
| COLLIN O'MARA, DAVID SMALL, | ) |
| CHARLES SALKIN, CITY OF LEWES, | ) |
| UNIVERSITY OF DELAWARE, | ) |
| PATRICK T. HARKER, SCOTT R. | ) |
| DOUGLASS, NANCY M. TARGETT, | ) |
| BLUE HEN WIND, INC., FIRST | ) |
| STATE MARINE WIND, LLC, and | ) |
| GAMESA TECHNOLOGY | ) |
| CORPORATION, INC., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Date Submitted:  September 4, 2015
Date Decided:  December 31, 2015

Gerald A. Lechliter, Lewes, DE, *Pro Se Plaintiff*.

Ralph K. Durstein, III, Devera B. Scott, and William J. Kassab, of DEPARTMENT OF JUSTICE, Wilmington, DE, *Attorneys for Defendants Delaware Department of Natural Resources & Environmental Control, Collin O'Mara, David Small, and Charles Salkin*.

Daniel L. McKenty and Michael W. Mitchell, of HECKLER & FRABIZZIO, Wilmington, DE, *Attorneys for Defendant City of Lewes*.

William E. Manning, Richard A. Forsten, and Allison J. McCowan, of SAUL EWING LLP, Wilmington, DE, *Attorneys for Defendants City of Lewes, University*

*of Delaware, Patrick T. Harker, Scott R. Douglass, Nancy M. Targett, Blue Hen Wind, Inc., First State Marine Wind, LLC, and Gamesa Technology Corporation, Inc.*

GLASSCOCK, Vice Chancellor

The Plaintiff, Col. Gerald A. Lechliter, lives on a cul-de-sac in Lewes. His property abuts a large parcel of land (the "Lewes Property") set aside as, but never used for, an industrial park. This large parcel was owned by the University of Delaware, and is adjacent to its Lewes campus. It is generally south of Canary Creek, and adjacent to the Great Marsh which lies north of Lewes. In 2002, the University sold the Lewes Property to the Delaware Department of Natural Resources and Environmental Control ("DNREC"), to be used as open space. The University reserved an easement over a portion of the Lewes Property near the Great Marsh, which gave it the right to enter and deposit dredge spoils. Eventually, the University and DNREC modified this easement, to allow the University and an entity it created to build a large windmill—an electricity-generating wind turbine— in the easement, with which the University could do research on generation of "clean" energy and supply itself and others with electrical power. The turbine was constructed in the easement, approximately one-half mile from Lechliter's home.

According to Lechliter, the operation of the wind turbine, through its noise and its stroboscopic emanations, disturbs his quiet enjoyment of his property. He brought this action for nuisance and related torts, *pro se*. In a manner reminiscent of his similar crusade against another use being made of a different portion of the old industrial park—a public dog park[1]—Lechliter has raised numerous challenges

---

[1] *See Lechliter v. DNREC*, 2015 WL 7720277 (Del. Ch. Nov. 30, 2015).

1

to the manner in which the wind turbine was approved, constructed, and operated, and has thrown into his complaint acts of local government unrelated to his claims concerning the turbine (for instance, his dissatisfaction with the way DNREC chooses those allowed to hunt on the Lewes Property). He has brought this action against the University, DNREC, the City, and others, seeking declaratory judgments, injunctive relief, and damages. Before me are the Defendants' Motions for Summary Judgment. For the following reasons, I reserve decision with respect to certain of the tort claims; otherwise the Motions are granted.

## I. BACKGROUND FACTS

### A. *The Parties*

Lechliter is a citizen of Lewes, Delaware.[2]

The State Defendants are the Delaware Department of Natural Recourses and Environmental Control ("DNREC"); Collin O'Mara, Secretary of DNREC; David Small, Deputy Secretary of DNREC; and Charles Salkin, Director of the Division of Parks and Recreation within DNREC (together, the "DNREC Defendants").[3]

The University of Delaware Defendants are the University of Delaware ("UD" or the "University"); Patrick T. Harker, UD President; Scott R. Douglass, UD Executive Vice-President; and Nancy M. Targett, UD Dean (together, the "UD

---

[2] Compl. ¶ 29.
[3] *Id.* at ¶ 30; Def. DNREC's Opening Br. 1.

Defendants").[4]

The Defendants also include the City of Lewes (the "City"); Blue Hen Wind, Inc. ("Blue Hen"); Gamesa Technology Corporation, Inc. ("Gamesa"); and First State Marine Wind, LLC ("First State") (together with the UD Defendants, the "City/UD Defendants").

*B. Overview*

### 1. DNREC Purchases the Lewes Property from UD

In 2002, using State funding through Delaware's Open Space Program, DNREC purchased from the University the Lewes Property, 260.94 acres of land adjacent to the University's Lewes campus.[5] In conjunction with the purchase—and included as consideration[6]—DNREC granted the University two easements, one of which was an easement (the "Original Easement") that allowed UD to continue using approximately 23 acres (the "Encumbered Land") to deposit dredge spoils, the historic use of that property.[7]

### 2. Construction of the Turbine on the Encumbered Land

The University first began contemplating the construction of a wind turbine in 2007 when it met with the City's Board of Public Works (the "City BPW") to

---

[4] Compl. ¶ 30; Defs. City/UD's Opening Br. 2 n.2.
[5] Compl. ¶ 33; Def. DNREC's Opening Br., Ex. A (Deed).
[6] Compl., Ex. 9 (Original Easement), at 49.
[7] *Id.* at ¶ 53; *id.*, Ex. 9 (Original Easement), at 50.

discuss the possibility of constructing a wind turbine in Lewes.[8] In 2008, UD started investigating a project to construct a wind turbine on its Lewes campus to conduct research and to provide carbon-emission-free electricity to the campus.[9] As part of its preliminary investigation, the University hired Sustainable Energy Developments, Inc. ("SED") to study the feasibility of the project (the "Feasibility Study").[10]

During 2009, the University moved beyond the planning phase and began taking steps toward the construction of a wind turbine. On July 24, 2009, UD and Gamesa[11] entered into a memorandum of understanding ("MOU") whereby the parties would jointly construct, own, and operate a wind turbine on UD's Lewes Campus.[12] Later that year, on October 19, 2009, the University and DNREC finalized an MOU (the "DNREC-MOU") that committed DNREC to provide UD the right to access and control a portion of the Lewes Property adjacent to the University for the purpose of constructing, owning, operating and maintaining a wind turbine.[13] The DNREC-MOU contemplated that DNREC would eventually convey back to UD the entire Lewes Property, or at least a parcel large enough to

---

[8] *Id.* at ¶ 34.
[9] *Id.* at ¶ 35.
[10] *Id.* at ¶ 36.
[11] The parties did not provide background facts about Gamesa. I note that, according to their website, Gamesa is a global company that constructs, operates, and maintains wind turbines. *See* GAMESA, http://www.GamesaCorp.com/en/ (last visited Dec. 23, 2015).
[12] Compl. ¶ 39; *id.*, Ex. 6 (DNREC-MOU), at 25.
[13] *Id.* at ¶ 41; *id.*, Ex. 6 (DNREC-MOU).

build the wind turbine, in exchange for either cash or another parcel owned by the University.[14]

On the same day, UD and Gamesa finalized an agreement to build a 410-foot tall, utility-scale 2 megawatt Gamesa Turbine (the "Turbine") on the University's Lewes Campus.[15] Pursuant to the agreement, UD formed Blue Hen, which together with Gamesa formed First State, a privately held LLC, to construct and operate the Turbine.[16]

A few months later, on January 11, 2010, the Lewes City Council ("City Council") held a public meeting, the agenda for which included the "presentation and consideration" of a memorandum of agreement with the University (the "City-MOA").[17] During the meeting, City Council voted to initiate an executive session— that is, a session held in private—in which the agenda indicated that topics other than the City-MOA would be discussed.[18] However, when City Council returned to open session, it approved the City-MOA, which included "modifications as discussed in [e]xecutive [s]ession," thus indicating—according to the Plaintiff—that

---

[14] *Id.* at ¶ 41; *id.*, Ex. 6 (DNREC-MOU), at 27.

[15] *Id.* at ¶ 43. According to the City/UD Defendants, the Turbine's supporting structure is 256 feet high, and the Turbine consists of three blades, which are each 144 feet in length. Defs. City/UD's Opening Br. 3. Using these measurements, the maximum height of the complete structure is 400 feet—that is, 10 feet less than the Plaintiff alleges. *Id.* The difference is immaterial for purposes of this Memorandum Opinion.

[16] Compl. ¶ 44; *id.*, Ex. 5 (Incorporation Documents).

[17] *Id.* at ¶ 46; *id.*, Ex. 8 (Agenda & Minutes for January 2010 Meeting), at 42.

[18] *Id.* at ¶ 47; *id.*, Ex. 8 (Agenda & Minutes for January 2010 Meeting), at 47.

the City-MOA was improperly discussed in private.[19]

Shortly thereafter, on February 2, 2010, DNREC, recognizing that the land had not yet been transferred in accordance with the DNREC-MOU, amended the Original Easement (as amended, the "Amended Easement") to allow the University to access the Encumbered Land to begin building the Turbine.[20] The Amended Easement granted the University the right to use the Encumbered Land for "any lawful purposes," but prohibited UD from subleasing the land or using it for "commercial uses."[21]

The next day, on February 3, 2010, DNREC Deputy Secretary David Small sent a letter to the City Solicitor stating that DNREC had approved the construction of the Turbine.[22] Weeks later, on February 16, 2010, representatives of the University and the City finalized the City-MOA, authorizing the construction of the Turbine.[23] Finally, on February 24, 2010, the University paid a building permit fee of $20,283, which was calculated based on 1% of the construction costs of the tower,

---

[19] *Id.* at ¶¶ 47–49; *id.*, Ex. 8 (Agenda & Minutes for January 2010 Meeting), at 48.

[20] *Id.* at ¶ 57. The Plaintiff alleges that an e-mail reveals that the Amended Easement is approximately 1.4 acres larger than the Original Easement. *Id.* at ¶ 88. The recorded document memorializing the Amended Easement does not purport to burden additional land, however. *See id.*, Ex. 10 (Amended Easement).

[21] *Id.* at ¶ 59; *id.*, Ex. 10 (Amended Easement), at 56. However, I note that the Amended Easement allows the University to "enter into license agreements for activities on the [Encumbered Land] with a limited liability company . . . or other entity of which the University is a member . . . where those activities are within the mission of the University, as determined by the University." *Id.*, Ex. 10 (Amended Easement), at 56.

[22] *Id.* at ¶ 69; *id.*, Ex. 20 (Letter from Small).

[23] *Id.* at ¶ 72; *id.*, Ex. 21 (City-MOA).

excluding the costs of the turbine mechanism itself.[24]  The City issued the building permit (the "Building Permit") on the same day.

In addition to its negotiations with the City and State, the University also applied to the United States Department of Energy ("USDOE") for federal grants, pursuant to the National Environmental Policy Act ("NEPA"), to assist in the construction and operation of the Turbine.  On April 1, 2010, the USDOE informed the University that an environmental assessment ("EA") would be required to receive federal funds under NEPA.[25]  According to its final EA, the USDOE determined a "Finding of No Significant Impact," and concluded that assisting the construction of the Turbine "would not constitute a major Federal Action significantly affecting the quality of the human environment."[26]

Construction of the Turbine commenced in March 2010 and the Turbine was operational in June 2010.

---

[24] *Id.* at ¶ 189–90.  According to the Plaintiff, and consistent with the building permit application, the application was submitted approximately two months earlier, on December 17, 2009, by SED on behalf of the University.  *Id.* at ¶ 183; *id.*, Ex. 7 (SED Letter).  The building permit fee, however, was not paid until February 24, 2010.  *Id.* at ¶ 189.

[25] *See id.*, Ex. 57 (USDOE Letter).

[26] *See id.*, Ex. 58 (Final EA).  The Plaintiff's answering brief includes allegations that UD provided inaccurate information to the USDOE when it conducted its EA.  *See* Pl.'s Answering Br. 28–32.  The Plaintiff requests that the Court

> take judicial notice of the facts related to the federal grants because these facts clearly demonstrate the pattern of misinformation DNREC, and the University with political pressure, used to obtain a favorable [EA].  *Id.* at 58.

However, the Plaintiff did not include in his Complaint any claims concerning DNREC's involvement with the USDOE.  To the extent the Plaintiff attempts to use these facts to establish a new cause of action against the Defendants in his answering brief in opposition to the Motions to Dismiss and for Summary Judgment, such a claim is untimely.

3. <u>Post-Construction Events</u>

On July 1, 2010, the Delaware Governor signed the 2011 Bond Bill, in which the General Assembly included in the bill's "epilogue language" a provision that authorized DNREC to sell back a portion of the Lewes Property to the University.[27]

In September 2010, the Plaintiff and two other citizens met with DNREC Secretary O'Mara and inquired as to whether DNREC had consulted the Open Space Council (the "OSC"), a body formed by statute to advise DNREC on land preservation issues, in regards to the DNREC-MOU or the Amended Easement.[28] O'Mara confirmed that DNREC had not.[29]

On November 30, 2011, the City BPW entered into an agreement with First State to purchase excess electricity generated by the Turbine.[30] Since operation of the Turbine commenced, First State has sold electricity to the University to power its Lewes campus and has sold the excess electricity to the City BPW.[31]

Finally, in anticipation that UD and DNREC would soon enter into an

---

[27] Compl. ¶ 84. Section 87 of the 2011 Bond Bill, titled "University of Delaware – Lewes Land," provides:

> The University of Delaware desires to acquire portions of land previously acquired from the University by [DNREC] which are located adjacent to the Sharpe [sic] Campus in Lewes. [DNREC] has determined that some of this land is now surplus to the Department's needs. In accordance with 30 Del. C. § 5423(c)(2), the General Assembly authorizes the Secretary of [DNREC] to negotiate a transfer of such land to the University in keeping with the requirements of this section. *Id.*, Ex. 30 (2011 Bond Bill).

[28] *Id.* at ¶ 90.
[29] *Id.*
[30] *Id.*, Ex. 70 (Memorandum of Understanding), at 425–27.
[31] *Id.* at ¶ 65.

8

agreement to transfer the Encumbered Land, the General Assembly again adopted "epilogue language" in the 2012 Bond Bill that authorized DNREC to transfer the parcel to UD; the language was nearly identical to that in the 2011 Bond Bill, except that it mentioned the operation of the Turbine and the use of the land for research purposes.[32] To date, DNREC and UD have not entered into an agreement to transfer or exchange the Encumbered Land.

### 4. The Turbine's Effect on the Plaintiff

The Turbine is located approximately one-half mile from the Plaintiff's residence. According to the Plaintiff, since the construction of the Turbine, many citizens living in close proximity have complained about its negative effects, including the level of noise it generates.[33] On December 22, 2010, the Plaintiff emailed Mayor Ford and the Lewes City Manager to inform them of the Turbine's alleged adverse effects; to date, the Plaintiff has yet to receive a response.[34]

Concerns of the type expressed by the Plaintiff have not been completely ignored, however. The University hired Tech Environmental, Inc. to perform two acoustical studies to examine the acoustic effects of the Turbine: one in 2009, before the Turbine's construction; and another in 2011, six months after the Turbine was

---

[32] Def. DNREC's Opening Br., Ex. B (2012 Bond Bill) ("The land is limited to the area on which the University is conducting research associated with the operation of a wind turbine . . . .").
[33] Compl. ¶ 131.
[34] *Id.*, Ex. 47 (Email); *id.* at ¶ 137.

operational.[35]  Despite the Plaintiff's allegations regarding noise, the Defendants allege the Turbine's noise level is compliant with all applicable regulations.[36]  In addition, the University hired SED to study the Turbine's stroboscopic "flicker effect," a phenomenon that occurs when turbine blades momentarily, but repeatedly, cast a shadow on the surrounding area when the blades pass in front of the sun.[37] The study concluded that the Turbine would not have an adverse flicker effect on the surrounding area.[38]  At Oral Argument on the instant Motions, the Plaintiff alleged that the he was suffering physical injury and property damage from the very-low-frequency sound emitted by the Turbine, which the University's studies did not address.[39]

### 5. The Connector Road Near the Turbine

In 2006, DNREC received $2.2 million from the Delaware Department of Transportation to construct a road connecting New Road to Pilottown Road in Lewes (the "Connector Road").[40]  About four years later, after the consideration of various proposed locations for the Turbine, it was built less than 600 feet from the planned— and afterwards constructed—Connector Road, which, according to the Plaintiff, is

---

[35] Aff. of Allison J. McCowan, Esq. in Supp. of Def's Motion for Summ. J. ("Aff. of Allison McCowan"), Exs. C (Acoustic Study) and D (Sound Compliance Study).
[36] *See* Defs. City/UD's Opening Br. 1.
[37] *See* Aff. of Allison McCowan, Ex. B (Shadow Flicker Analysis).
[38] *See id.*
[39] Oral Arg. Tr. 58–60 (Unofficial Transcript).  I note that oral argument on the instant Motions was held on September 4, 2015, but none of the parties requested an official copy of the transcript.
[40] Compl., Ex. 6 (DNREC-MOU), at 4.

inadequate according to DNREC's own safety specifications.[41]

## II. PROCEDURAL HISTORY

The Plaintiff filed his Verified Complaint on October 11, 2012. The Complaint alleged seven counts against the Defendants: Count I alleges that DNREC violated numerous statutes to illegally build the Turbine; Count II alleges that the City violated statutes and zoning ordinances to illegally issue the Building Permit; Counts III and IV allege violations of the Delaware Freedom of Information Act ("FOIA") against DNREC and the City, respectively; Count V alleges that DNREC allows selected individuals to hunt illegally; Count VI alleges that the Defendants committed nine torts in the construction and operation of the Turbine; and Count VII alleges that DNREC and UD acted with gross and wanton negligence by approving UD's realignment of the Connector Road. In addition, the Plaintiff alleges that DNREC conspired with UD, Gamesa, Blue Hen, and First State to perform the wrongs alleged in Count I; similarly, the Plaintiff alleges that the City conspired with the UD Defendants to perform the wrongs alleged in Count II.

In relief, the Plaintiff seeks numerous declaratory judgments and various forms of injunctive relief, including the removal of the Turbine, as well as damages.

On June 24, 2013, I granted the parties' Stipulation to Stay the Case pending the resolution of a related federal action, also brought by the Plaintiff, which

---

[41] *Id.* at ¶¶ 200–17.

"involve[ed] the same universe of alleged facts underlying [] this action." On October 10, 2013, Plaintiff filed a Motion for Temporary Restraining Order to prevent construction of the Connector Road, which I denied via Letter Opinion of October 22, 2013.[42]

On January 16, 2015, the District Court granted the defendants' motion to dismiss and on January 28, I granted Plaintiff's Motion to Lift Stay of Proceedings.

On April 2, 2015, the City/UD Defendants filed a Motion for Summary Judgment. On April 6, 2015, the DNREC Defendants filed a Motion to Dismiss. The parties submitted briefing on both Motions in June and July. I heard oral argument on September 4, 2015. This is my Memorandum Opinion.

## III. STANDARD OF REVIEW

The Defendants filed two dispositive motions in response to the Plaintiff's claims. The City/UD Defendants filed a Motion for Summary Judgment on Counts I, II, IV, VI, and VII. The DNREC Defendants filed a Motion to Dismiss Counts I, III, V, VI, and VII under Court of Chancery Rule 12(b)(6), for "failure to state a claim upon which relief can be granted." However, the DNREC Defendants' opening brief and the Plaintiff's answering brief cited evidence that was not included in the Plaintiff's Complaint. Moreover, the City/UD Defendants moved for summary judgment on many of the same counts. All of the parties, including the

---

[42] *Lechliter v. DNREC*, 2013 WL 5718888 (Del. Ch. Oct. 22, 2013).

12

Plaintiff, have been given ample opportunity to supplement the record and I find that none of the parties would be prejudiced by an application of the standard applicable to a motion for summary judgment. In light of the foregoing, I convert the DNREC Defendants' Motion to Dismiss to a Motion for Summary Judgment,[43] thus applying the applicable standard to all of the Plaintiff's Counts, as set forth below.

Summary Judgment should be granted where, considering the facts in the light most positive to the non-moving party, the moving party has established that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[44]

## IV. ANALYSIS

The Plaintiff's Complaint asserts a slew of claims against the Defendants, both individually and as a part of a conspiracy. Col. Lecliter is an intelligent man, articulate in written and oral communication. He is not legally trained, however, and has taken the opportunity here to complain of the actions of the Defendants in ways that sometimes approach the border between creative and frivolous. As a result, my analysis below is necessarily[45] an inelegant dog's breakfast, the episodic treatment of claims in which will no doubt try the reader's patience. Because of the

---

[43] *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168–69 (Del. 2006).

[44] Ct. Ch. R. 56(c).

[45] Necessarily, that is, given not only the nature of the action, but also this judge's limitations as a writer.

idiosyncratic organization and presentation of the Complaint, I have found it difficult to determine precisely what causes of action the Plaintiff asserts. I limit my analysis here to those claims that have been clarified in the briefing or at oral argument; all remaining allegations not briefed or otherwise explained are considered waived.[46]

*A. Claims Against DNREC for Granting the Original Easement*

In Count I, the Plaintiff alleges that the Original Easement granted in 2002 represents "a misuse of taxpayer dollars," and argues that the use prescribed therein did not conform to any of the purposes enumerated in the Delaware Land Preservation Act (the "DLP Act") for which DNREC can acquire real property.[47] Additionally, the Plaintiff points to 29 *Del. C.* § 9403 and argues that DNREC lacked the power to grant the Original Easement because the Director of the Office of Management and Budget has been given the sole authority to grant easements.[48] In

---

[46] *See In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *26 (Del. Ch. Oct. 24, 2014) (waiving the plaintiffs' claim where they "did not mention [the claim] in their Opposition Brief or at the Argument") (citing *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in his brief.")).

[47] Specifically, 7 *Del. C.* § 7503(a) provides the following:

> State agencies may acquire any interest in real property for the following purposes . . . : (1) To protect and conserve all forms of natural and cultural resources; (2) To protect and conserve the biological diversity of plants and animals and their habitat; (3) To protect existing or planned parks, forests, wildlife areas, nature preserves or other recreation, conservation or cultural sites by controlling the use of contiguous or nearby lands; (4) To preserve sites of special natural, cultural or geological interest; (5) To connect existing open spaces into a cohesive system of greenways and resource areas; (6) To provide for public outdoor recreation; and (7) To allow for water resource conservation.

[48] 29 *Del. C.* § 9403 states: "For purposes of this chapter the granting of an easement shall not be considered a conveyance of real property. The determination to grant an easement *shall be at the discretion of the Director of the Office of Management and Budget*" (emphasis added).

14

response, DNREC argues that all claims concerning the Original Easement should be time-barred under the doctrine of laches.

The doctrine of laches supports denial of a plaintiff's request for equitable relief when the plaintiff has unreasonably delayed in seeking that relief, and such delay has prejudiced the defendant.[49] DNREC asserts that the Plaintiff's allegations regarding the Original Easement are time-barred because the Plaintiff's Complaint was filed after the analogous three-year statute of limitation for actions "based on a statute," as provided in 10 *Del. C.* § 8106(a). Although the statute of limitation does not strictly bind a court in equity in a laches analysis, the statute will ordinarily bar a claim unless the plaintiff can show the existence of "unusual conditions or extraordinary circumstances."[50] Here, the Plaintiff contends unusual facts and circumstances exist that justify the tolling of his claims, because he was unaware of the Original Easement in 2002, because the 2002 deed "makes no mention of any easements," and because there is "no evidence that these easements were referred to the OS Council for advice and consultation."[51] Ultimately, the Plaintiff urges me to find that his claims are not barred because he filed his Complaint "well within [two] years of discovering [the Original Easement] through a FOIA request."[52]

---

[49] *See Reid v. Spazio*, 970 A.2d 176, 182 (Del. 2009); *Martin v. Med-Dev Corp*, 2015 WL 6472597, at *15 (Del. Ch. Oct. 27, 2015) (citing *U.S. Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996)).

[50] *See Reid*, 970 A.2d at 184 (citing *Wright v. Scotton*, 121 A. 69, 72–73 (Del. 1923)).

[51] Pl.'s Answering Br. 64–65.

[52] *Id.* at 65.

The Plaintiff's argument is not persuasive, however. The Original Easement provided that the University could continue using the Encumbered Land for the disposal of dredge spoils, which the Complaint itself avers that the University did for seven years before the Plaintiff filed his Complaint. It is clear that there was no attempt to conceal the fact or effect of the University's retention of the Original Easement.

The Plaintiff has failed to allege any additional facts to establish unusual or extraordinary circumstances that would justify tolling his claims beyond the statutory time limitations, and his claims are therefore barred by laches. As a result, I grant summary judgment in favor of the Defendants for the claims in Count I that allege violations of statutes arising from the grant of the Original Easement. Because of this decision, I need not reach the Defendants' argument that the Plaintiff lacks standing to proceed on this claim. However, I note that even if this claim was not time-barred, the Original Easement was a part of the purchase transaction itself, and thus did not involve the disposition of public lands, or the granting of an easement thereon; accordingly, the Plaintiff's claims are without merit.[53]

---

[53] The Plaintiff supposes, erroneously in my view, the existence of a brief moment in time, between the purchase of the Lewes Property and the grant of the Original Easement, where the Encumbered Land became protected under the DLP Act. Therefore, the Plaintiff alleges that the grant of the Original Easement converted the permanently protected status of the parcel, in violation of the DLP Act. However, the Original Easement was contemplated to be included as consideration for the purchase of the Lewes Property, and the transfer of the Lewes Property to, and the grant of the easement from, DNREC were virtually simultaneous. Consequently, I deem the purchase and grant a single, simultaneous transaction. The Encumbered Land was never subject to the strictures

*B. Claims Against DNREC Concerning the DNREC-MOU and the Amended Easement*[54]

In Count I of the Complaint, the Plaintiff alleges that DNREC acted *ultra vires* when it approved the DNREC-MOU in October 2009 and also when it amended the Original Easement in February 2010. The Plaintiff argues that in each instance DNREC violated numerous statutes because it failed to take mandated prerequisite action before entering these agreements.

The DNREC Defendants argue that the Plaintiff's claims based on alleged statutory violations should be rejected because the Plaintiff lacks standing to bring his claims. A private individual has a right of action under a statute, in general, only where the statute so provides.[55] An exception exists where a plaintiff has suffered an injury-in-fact as a result of the statutory violation, and the interest damaged is within the "zone of interest" addressed by the statute; in other words, where the plaintiff has suffered a concrete injury of the type the statute was intended to prevent. The Plaintiff does not point to any statute itself to confer a private right of action to seek review of the alleged violations; instead, the Plaintiff argues that he has standing because DNREC's statutory violations caused him to suffer an injury. In

---

of the DLP Act, and was therefore not subject to the provisions that the Plaintiff argues DNREC violated here.

[54] In this section, I consider only the claims against DNREC, individually. The Plaintiff's related conspiracy claims are analyzed together and discussed elsewhere.

[55] *See Oceanport Indus. v. Wilmington Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994) ("[N]o party has a right to appeal unless the statute governing the matter has conferred the right to do so.").

addition, the Plaintiff argues that he has taxpayer standing to challenge the grant of the easements.[56] I analyze each of the Plaintiff's standing arguments in turn and find that the Plaintiff lacks individual standing, but that the Plaintiff has taxpayer standing to bring claims concerning the Amended Easement.

### 1. Individual Standing

This Court applies the "concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are mere intermeddlers."[57] The plaintiff bears the ultimate burden of establishing standing to bring a claim.[58] Where, as is the case here, the plaintiff has not alleged that a statute expressly provides standing, the plaintiff may establish standing by meeting a two-part test. First, the plaintiff must demonstrate the he has suffered an "injury-in-fact"; second, the plaintiff must demonstrate that the interest he seeks to protect is within the zone of interest to be protected by the statute in question.[59] The Delaware Supreme Court has held that this test entails the following inquiry:

> (1) [T]he plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the

---

[56] Pl.'s Answering Br. 34–40.

[57] *Dover Historical Soc. v. City of Dover Planning Com'n*, 838 A.2d 1103, 1111 (Del. 2003) (quotation omitted). Federal courts apply a similar requirement due to their jurisdictional limits under Article III of the United States Constitution.

[58] *Id.* at 1109.

[59] *O'Neill v. Town of Middletown*, 2006 WL 205071, at *28 (Del. Ch. Jan. 18, 2006) (citing *Dover Historical Soc.*, 838 A.2d at 1110).

18

defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[60]

Finally, in order to establish standing, the plaintiff's "interest in the controversy must be distinguishable from the interest shared by other members of a class or the public in general."[61]

In Count I of the Complaint, the Plaintiff does not allege a particular injury, but instead relies solely on the contention that the alleged statutory violations have caused him "tort damages."[62] In the Plaintiff's answering brief, he argues that he has sufficiently plead an injury to establish standing by pointing to the following injuries:

> "Turbine proximity, noise, proximity to the walkway on which he regularly walks, loss of property and aesthetic value, and UD's denial of [the Plaintiff's] access to land purchased for permanent preservation as Open Space."[63]

The Plaintiff also alleges that he has suffered adverse "health effects."[64] For the purpose of assessing standing in Count I, I will assume that these alleged injuries are those alleged as "tort damages" in his Complaint. I note that the aesthetic and access damages are shared with the public at large, and cannot support an injury-in-fact,

---

[60] *Id.* (citing *Dover Historical Soc.*, 838 A.2d at 1110).
[61] *Stuart Kingston, Inc. v. Robinson*, 596 A.2d 1378, at 1382 (Del. 1991) (citation omitted).
[62] Compl. 56.
[63] Pl.'s Answering Br. 40.
[64] *Id.*

but, since the Plaintiff has alleged in the record both personal injury and damage to his property value as a result of the operation of the turbine, I will consider those the injury alleged here.

The first statutory violation alleged by the Plaintiff is that DNREC violated the DLP Act because it failed to consult with the OSC before approving the DNREC-MOU and before granting the Amended Easement. The DLP Act, at 7 *Del. C.* § 7506(6), provides that the OSC shall "[a]dvise and consult regarding any change from permanently protected status of open space lands acquired or otherwise protected." Plaintiff asserts that DNREC was required to consult the OSC here because the DNREC-MOU and the Amended Easement changed the status of the Encumbered Land from permanently protected status.[65] The Plaintiff alleges that DNREC's failure to consult the OSC has caused him tort damages, presumably to his health and property values.

Second, the Plaintiff argues that DNREC violated statutes concerning the "Conservation Trust Funds" because DNREC failed to obtain an Act of the General Assembly before signing the DNREC-MOU and granting the Amended Easement.[66]

---

[65] 7 *Del. C.* § 7506(6) provides that "[t]he Council shall . . . (6) [a]dvise and consult regarding any change from permanently protected status of open space lands acquired or otherwise protected." The operation of the statute in circumstances closely related to those present here is discussed in *Lechliter,* 2015 WL 7720277.

[66] Additionally, the Plaintiff points to 30 *Del. C.* § 5423(c)(2), which requires that, "[i]f the General Assembly approved the sale of any project or portion thereof, the State shall receive its pro rata share of net sale income." Therefore, Plaintiff argues that the section only "authorizes the sale . . . of the protected, public trust Open Space, not the exchange for other land stipulated in the

20

The Plaintiff points to 30 *Del. C.* § 5423 which states, in part, the following:

> It is intended that property acquired with funds from the Endowment Account shall remain in public outdoor recreation and conservation use in perpetuity. Said property may not be converted to other uses *without a subsequent act of the General Assembly*.[67]

The Plaintiff alleges that DNREC was required to obtain an act of the General Assembly pursuant to Section 5423 because the DNREC-MOU and the Amended Easement converted the use of the Encumbered Land. Furthermore, the Plaintiff argues that due to this statutory violation[68] by DNREC, he has suffered "tort damages," presumably injury to his health and property values.

Finally, the Plaintiff argues that DNREC violated Delaware Code Chapter 94, titled "Real Property Distributions," because DNREC failed to follow the statutory procedures that are required to declare property surplus. The Plaintiff points to three provisions within that Chapter. First, the statute provides that the "Commission on

---

[DNREC-MOU] or the granting of an easement for the use of land bought with Project Account funds." Pl.'s Answering Br. 45.

[67] 30 *Del. C.* § 5423(c)(2) (emphasis added).

[68] Because I find that the Plaintiff lacks standing, I need not reach DNREC's assertion that it did comply with Section 5423, pointing to the actions of the General Assembly in the 2011 and 2012 Bond Bills. The Plaintiff attacks the 2011 and 2012 Bond Bills on at least two grounds. First, the Plaintiff asserts that 30 *Del. C.* § 5423(c)(2) requires an Act of the General Assembly *before* converting the use of land and that the Bond Bills were approved *after* DNREC signed the DNREC-MOU and granted the Amended Easement—an argument, I note, that is inconsistent with the language of the statute itself, which requires a "subsequent" Act of the General Assembly. In addition, the Plaintiff asserts that the 2011 and 2012 Bond Bill cannot satisfy the requirement of Section 5423 because the General Assembly "circumvented the normal legislative process" by inserting mere "epilogue language," which cannot serve as an "Act of the General Assembly." Moreover, the Plaintiff argues that the Bond Bills failed to indicate that its authorization was to remain effective beyond the fiscal year enacted.

21

State Surplus Real Property" is tasked with determining how to utilize land that has been designated as surplus.[69] This commission must review a proposed conveyance of real property before it can be "sold, leased, transferred or otherwise conveyed."[70] Second, the statute states that "the granting of an easement shall not be considered a conveyance of real property," but provides that "[t]he determination to grant an easement shall be at the discretion of the Director of the Office of Management and Budget."[71] Finally, the statute contains a special requirement for parcels of land designated as State parks and open space:

> Notwithstanding any provision of this chapter to the contrary, no state park, or any part thereof, open space as defined in § 7504 of Title 7 or other area acquired primarily for recreational use, shall be rezoned, neither shall there be a change in the use of any such lands requiring a variance or subdivision approval, except upon 45 days prior notice to all elected members of the General Assembly in whose district such lands, or any part thereof, lie.[72]

The Plaintiff alleges that DNREC violated the statute because, before signing the DNREC-MOU, it failed to (1) properly designate the Encumbered Land as surplus, and (2) notify the members of the General Assembly in whose district the Encumbered Land lies. Additionally, the Plaintiff alleges that DNREC improperly granted the Amended Easement because it failed to seek the discretion of the

---

[69] *See* 29 *Del. C.* § 9405.
[70] *See id.* at § 9403.
[71] *See id.* at § 9403.
[72] *Id.* at § 9406.

Director of the Office of Management and Budget. The Plaintiff again argues that he suffered "tort damages" as a result of these statutory violations.

The syllogism advanced by the Plaintiff, as I understand it, runs thus: the Defendants failed to clear certain procedural hurdles required to lawfully build the Turbine, and if the Turbine had not been built, it would not emit sounds or create the flicker effect, and it is those emissions that have injured him. Thus, he has suffered an injury-in-fact and has standing to litigate the violations of statute. This analysis, however, is fatally flawed.

First, the injury complained of is not sufficiently related to the statutory breaches to amount to an injury-in-fact for standing purposes. The Plaintiff has not alleged, nor could he, that the Defendants could not have cleared the hurdles he alleges they wrongfully refused to try. There is nothing in the record to show that the failure of DNREC to consult with the OSC, for instance, which failure the Plaintiff alleges violated the DLP Act, would have resulted in the OSC recommending against the Turbine; or that DNREC would have followed such a recommendation, which would have been purely precatory. Thus, the relationship between any violation and the damage alleged is insufficiently concrete to afford standing here.

More fundamentally, the Plaintiff's injuries are not in the zone of interest addressed by any of the statutes he cites. The DLP Act seeks to preserve open space

23

and protect the environment. The same is true of 30 *Del. C.* § 5423. Finally, 29 Del. Code §§ 9401 *et seq.* is intended to protect the property interests of the State of Delaware, as well as to preserve open space. The fact that violations of these statutes led to construction of a windmill, emanations from which subsequently injured the Plaintiff, is a mere fortuity; none of the statutes cited had the intent of preventing the harm the Plaintiff has allegedly suffered, and his injuries, therefore, are outside the zone of interests protected thereby. The Plaintiff, if he has suffered an injury, may pursue his damages in tort, but lacks standing to vindicate the statutory violations of which he complains.[73]

### 2. Taxpayer Standing

The Plaintiff argues that he has taxpayer standing to challenge the Original Easement and Amended Easement. In Delaware, taxpayer standing is "reserved for a narrow set of claims involving challenges either to expenditure of public funds or use of public lands."[74] It provides a plaintiff–taxpayer standing regardless of any

---

[73] I note that in Count I of the Complaint, the Plaintiff alleges that DNREC also violated portions of the Coastal Zoning Act because it "never submitted plans for the Turbine to a pre-construction Status Decision." Compl. ¶ 236; 7 *Del. C.* §§ 7001–13. It is unclear to me whether the Plaintiff has continued to support this claim in his answering brief or at oral argument. To the extent that the Plaintiff has not waived this claim, he lacks standing for the same reasons stated above: he has not sufficiently alleged a concrete injury-in-fact, nor does his alleged injury fall within the zone of interest addressed by the Coastal Zoning Act. The Coastal Zoning Act was designed to protect the State's natural environment and not to prevent "tort damages" as alleged by the Plaintiff here.

[74] *Reeder v. Wagner*, 974 A.2d 858, at *2 (Del. 2009) (citing *O'neil*, 2006 WL 4804652 at *20).

showing of special damages.[75]

Here, the Plaintiff argues that he has taxpayer standing because the grants of the Original Easement and Amended Easement represent both a "misuse of taxpayer dollars" and a "misuse of public land."[76] I have already concluded that the Plaintiff's claims concerning the Original Easement are barred by laches. To the extent the Plaintiff alleges that the Amended Easement represents a misuse of public funds, his argument is unavailing because DNREC did not expend any funds, of any kind, when it agreed to amend the easement.

That leaves the Plaintiff's claim that the Amended Easement is a misuse of public land. The foundational case for taxpayer standing regarding publicly-owned real property is *City of Wilmington v. Lord*.[77] In *Lord*, a group of taxpayers challenged the erection of a water tank on city-owned land that had been previously designated to be used for public park purposes.[78] The plaintiff–taxpayers argued that the construction of a water tank was illegal because it did not conform to the

---

[75] *Danvir Corp. v. City of Wilmington*, 2008 WL 4560903, at *3 (Del. Ch. Oct. 6, 2008) (citation omitted).

[76] DNREC argues that the Plaintiff failed to allege taxpayer standing in his Complaint. However, I note that the Plaintiff broadly asserted in Count I of his Complaint that "Defendant DNREC and UD-related defendants' actions are a misuse of public land." Compl. ¶ 240.

[77] 378 A.2d 365 (Del. 1977).

[78] Specifically, the parcel of land had been donated to the city using a deed that included an express condition that the land be used for public park purposes. *Id.* at 637. Furthermore, to receive the land, the city acted pursuant to a statute that gave it the authority to acquire real property "for the purpose of providing and maintaining one or more open places or parks." *Id.* After being used for many years as a golf course, the city proposed building a water tank on the land. *Id.*

25

land's designated purpose and would thus violate the public trust; in response, the city argued that the plaintiffs did not have standing to bring the claim.[79] To address the issue of standing, the Court noted that a taxpayer has a "sufficient stake" in the proper use of tax receipts to "allow him to challenge improper uses of tax funds."[80] Recognizing that the plaintiffs in that case had challenged, not the use of funds, but the use of property, the Court extended taxpayer standing to encompass a challenge to the use of real property:

> The improper use of publicly held real property is sufficiently analogous to the improper use of public money so that if a taxpayer has a legal right to sue in the latter case, then necessarily a taxpayer should have a similar right in the former case.[81]

Accordingly, the Court held that "where a property is held under an express trust for public park purposes, a taxpayer has standing to sue to enjoin an alleged violation of that trust."[82] In this case, the Plaintiff asserts that the Amended Easement permits certain uses of the Encumbered Land that "fail to conform to the statutory covenants for the use of protected, public trust open space listed in the DLP Act."[83] This allegation is sufficient to obtain taxpayer standing under the standard articulated in *Lord*. The Plaintiff alleges that a parcel of land is held in the public trust and has been designated as open space, thereby limiting the use of the land. Furthermore,

---

[79] *Id.*
[80] *Id.*
[81] *Id.* at 638 (citations omitted).
[82] *Id.* at 640.
[83] Pl.'s Answering Br. 34.

26

the Plaintiff argues that the Amended Easement allows the University to use the parcel for uses other than those permitted by statute, namely, the building of the Turbine. Therefore, I find that the Plaintiff has taxpayer standing to challenge the Amended Easement, and address the substance of these allegations next.

### 3. The Amended Easement as a Misuse of Public Property

I have already described the statutory violations that the Plaintiff alleges to establish his claim that the Amended Easement was a misuse of public property. In sum, the Plaintiff argues that there are various statutes to which DNREC failed to adhere in amending the Original Easement and creating the Amended Easement, because that amendment resulted in a change of the status of the land from DLP Act-protected open space.

DNREC contends, and I agree, that the Plaintiff's challenge to the Amended Easement must be dismissed because it is based on the "false premise" that the Encumbered Land was once state-owned, permanently protected open space under the DLP Act,[84] unencumbered by the private rights embodied in the easement. The Plaintiff argues that the entirety of the Lewes Property became protected open space upon DNREC's purchase, thus assuming that there was a moment in time, between

---

[84] This analysis deals with the Plaintiff's arguments that the Easements wrongfully converted property purchased under the DLP Act from protected open space to the private use of the University and its affiliates. It should not be confused with the Plaintiff's allegations that the Turbine violates the City's zoning code because the Lewes Property is zoned "Open Space." *See infra* Section IV.C.

the purchase of the Lewes Property and the grant of the Original Easement, where the Encumbered Land was subject to the restrictions on development in the DLP Act. However, the Original Easement was explicitly included as consideration for the purchase of the Lewes property; in fact, the grant and the purchase were virtually simultaneous. Consequently, I deem the purchase and the grant a single, simultaneous transaction. The Encumbered Land, therefore, was never DLP Act-protected open space, unencumbered by a right of private usage in favor of the University. The Encumbered Land was purchased from UD *without* the right to exclude UD: it was, and remained, land subject to the deposition of dredge spoils by the University. In light of this fact, DNREC's subsequent amendment to the Original Easement likewise could not have converted the Encumbered Land from public open space to land subject to private use, since the Encumbered Land was reserved, in any event, to the use of the University as a spoils ground.[85]

---

[85] In addition, the Plaintiff alleges that the Amended Easement added acreage to the Original Easement. Pl.'s Answering Br. 18. If the additional acreage was originally protected open space, and if the record indicated that that acreage was now occupied by the Turbine, then the Plaintiff might be able to show that DNREC illegally converted the additional acreage from protected open space. However, the Plaintiff has failed to support this claim. According to the terms of the Amended Easement, the only purpose of the amendment is to "clarify the ability of [UD] to utilize the Area for its purposes"; the terms do no mention additional acreage. *See* Compl., Ex. 10 (Amended Easement). The Plaintiff's only evidence for his contention that the Amended Easement included additional land not subject to the Original Easment is an email that he received in response to a FOIA request. That email was authored by the Manager of the Land Preservation Office, a Division of Parks and Recreation. In it, the Manager states that the Amended Easement increased the Encumbered Land by 1.4 acres. *Id.*, Ex. 28 (Email). The Plaintiff, however does not allege or point to record evidence that the Turbine is located outside the Original Easement, and I note that the terms of the Amended Easement do not purport to extend the burdened area.

4. <u>The University's Violation of the Amended Easement</u>

In Count I, the Plaintiff also alleges that the University violated the terms of the Amended Easement by allowing First State, a "third-party, for-profit LLC" to sell electricity generated by the Turbine.[86]  According to the Plaintiff, the Amended Easement prohibits "commercial uses" and, otherwise, does not contemplate that First State would operate the Turbine.[87]  In response, the Defendants contend that the Plaintiff lacks standing to enforce the Amended Easement because the Plaintiff was not a party to the agreement.  The Plaintiff did not attempt to establish standing to enforce the terms of the Amended Easement in his answering brief or at oral argument and, therefore, the Plaintiff's claim is waived.[88]

Based on the foregoing, I grant summary judgment in favor of the Defendants for all of the Plaintiff's claims in Count I.[89]

---

Therefore I conclude that the email, whatever its evidentiary value, does not create an evidentiary issue for trial.

[86] Pl.'s Answering Br. 16.

[87] *Id.*

[88] *See In re Crimson Exploration Inc. S'holder Litig.*, 2014 WL 5449419, at *26 (Del. Ch. Oct. 24, 2014) (waiving the plaintiffs' claim where they "did not mention [the claim] in their Opposition Brief or at the Argument") (citing *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ("It is settled Delaware law that a party waives an argument by not including it in his brief.")).

[89] I note that the Defendants argue that all of the Plaintiff's allegations have been cured by "legislative fiat" through the 2011 and 2012 Bond Bills.  In response, the Plaintiff argues that the bills merely contemplate the sale of the land and are, otherwise, silent as to the easements. Additionally, the Plaintiff questions whether the bills' authorizations, if any, extend beyond their fiscal year.  I need not consider the relevance of the Bond Bills to the facts here because I have already dismissed the Plaintiff's claims on other grounds.

*C. Claims Against the City for Approving the City-MOA and Granting the Building Permit*

In Count II of his Complaint, the Plaintiff challenges the process by which the City approved the construction of the Turbine, asserting claims against the City and the UD Defendants.[90]  As a result of these process violations, the Plaintiff argues that the City-MOA and Building Permit are "legal nullities."[91]

The Plaintiff alleges that the City-MOA "effectively rezoned the [Encumbered Land] from Open Space in the 2005 Comp Plan to University without following proper procedures."[92] In other words, to the extent the City-MOA indicates any zoning status other than "Open Space," the City-MOA would have effectively, but improperly, rezoned the Encumbered Land from "Open Space" to a new status: "University."[93]  To support this claim, the Plaintiff asserts that the City-MOA incorrectly indicates that the Encumbered Land is zoned as "University,"

---

[90] In this section, I consider only the claims against the City, individually.  The Plaintiff's related conspiracy claims are analyzed together and discussed elsewhere.

[91] Pl.'s Answering Br. 72.  In addition, the Plaintiff alleges for the first time in his answering brief that the City-MOA was breached. *Id.* at 24.  According to the Plaintiff, the City-MOA "preclude[d] any commercial activity without prior written consent of the City." *Id.* However, the Plaintiff argues that First State—a for-profit entity—was allowed to conduct "commercial activity" without obtaining consent in accordance with the MOA. *Id.*  To the extent this is an attempt to state a claim, raised for the first time in a brief in opposition to Motions to Dismiss and for Summary Judgment, it is untimely, and I have not considered it here.

[92] *Id.* at  8.  This argument regarding the zoning of the Lewes Property as "Open Space" should not be confused with Plaintiff's argument that certain restrictions applied to the Encumbered Land because it was acquired as protected open space under the DLP Act, addressed above.

[93] *See id.* 9.  The Plaintiff refers to an email from then-Mayor Ford in which Ford stated that if any land ownership was transferred, the zoning of the land would change from "Open Space" to "University." *See* Comp., Ex. 61 (Email), at 366.

and therefore, per the Plaintiff, the City-MOA improperly effects a "rezoning" of the Encumbered Land.

I find the Plaintiff's rationale hard to follow. As the Defendants point out, the City-MOA contains a simple inaccuracy: the City-MOA mistakenly indicates that the Encumbered Land was zoned "University" when it was actually zoned as "Open Space." The Plaintiff has failed to show how this inaccuracy caused the Plaintiff an injury or is otherwise actionable.

The Plaintiff also challenges the issuance of the Building Permit for the Turbine by the City. First, he argues that if the City-MOA did not effectively rezone the Encumbered Land, the University would have had to request that the parcel be rezoned before receiving a Building Permit for the Turbine, which it failed to do.[94] Second, the Plaintiff asserts that the Building Permit was improperly issued because the fee assessed in conjunction with the permit was "greatly reduced."[95] According to the Plaintiff, the Building Permit application improperly excluded the costs of the Turbine itself and only accounted for the construction costs of the tower on which it is located, thus significantly, and improperly, reducing the Building Permit fee.[96]

---

[94] Pl.'s Answering Br. 70.

[95] *Id.* at 9. The Plaintiff also appears to challenge the height variance that was allegedly granted in order to obtain the building permit. The Plaintiff has failed to specifically articulate a claim regarding the City's decision to exempt the Turbine from any height restrictions, other than to allege that documentation of the City's decision was not provided to him in any City FOIA responses. *See id.* at 24.

[96] *See id.* at 26–27. Plaintiff alleges the excluded costs of the Turbine were approximately $3,000,000. *See id.*

Finally, the Plaintiff alleges that the Building Permit application inaccurately stated that UD owned the property.[97]

The Plaintiff's challenge to the issuance of the Building Permit is fatally untimely. The City Building Code provides that an appeal may be taken to the Board of Building Code Appeals "by any person aggrieved by a decision of the Building Official" within 20 days.[98] In response, the Plaintiff argues that appealing to the Board of Building Code Appeals would have been "futile," but fails to indicate why this is so. The permit was exercised and the Turbine was constructed over two years before the Plaintiff filed his Complaint. Having eschewed his right under the Code to seek redress, the Plaintiff is barred by laches from litigating the matter here.

*D. FOIA Claims Against DNREC and the City*

The Plaintiff alleges in Counts III and IV that both DNREC and the City violated the Delaware FOIA.[99] In Count III, the Plaintiff alleges that DNREC violated the Open Meeting provisions of the Delaware FOIA because (1) DNREC did not publish an agenda for the public meeting *of the OSC* on June 6, 2012; (2) DNREC employees discussed an unauthorized topic during an executive session at that *OSC meeting*; and (3) DNREC published an agenda for the public meeting *of*

---

[97] *Id.* at 27–28.
[98] 70 Lewes Code § 70-60.
[99] 29 *Del. C.* §§ 10001–07.

*the OSC* on September 16, 2012 that did not meet the specificity requirements.[100]

DNREC argues that this FOIA claim should be dismissed because DNREC is not the proper party for the Plaintiff's claim. According to DNREC, the OSC is a separate entity, created by statute, and DNREC merely supports the OSC. Moreover, DNREC argues that it has no authority over the OSC, which, DNREC argues, is the proper subject of the Plaintiff's FOIA claims. The Plaintiff did not respond to DNREC's argument in his answering brief and, as a result, the Plaintiff has waived the FOIA claim in Count III. Therefore, I grant summary judgment in favor of the Defendants as to Count III.

In Count IV, the Plaintiff alleges that "City Council has flagrantly and consistently violated provisions of the FOIA."[101] The Plaintiff's only support for this allegation is to incorporate by reference "all allegations set forth" in his Complaint.[102] The Defendants argue that the Plaintiff's allegations are "conclusory allegations that may be ignored on a motion for summary judgment."[103] Moreover, the Defendants assert that any FOIA violations related to the Turbine are time-barred, alluding to the untimely allegations asserted in Count II. In Count II, the Plaintiff asserts various allegations against the City regarding the January 2010 City

---

[100] Compl. ¶ 270.
[101] *Id.* at ¶ 272.
[102] *Id.* at ¶ 271.
[103] Defs. City/UD's Opening Br. 14.

Council meeting. The Plaintiff alleges that the agenda published for the January 2010 public meeting failed to give the public proper notice that City Council was going to vote on its approval of the City-MOA.[104] According to the Plaintiff, the agenda merely disclosed that the City-MOA was going to be "discussed" and "considered."[105] In addition, the Plaintiff challenges the executive session that was held during that City Council meeting. According to the Plaintiff, the City-MOA was discussed during the executive session despite the fact that neither the agenda nor the minutes of the meeting included the City-MOA as a topic.[106] According to the Plaintiff, the City's failure to properly notify its citizens that it intended to vote on approving the City-MOA was a violation of his procedural due process rights.[107] The City argues, and I agree, that these allegations are more accurately characterized as violations of the open meetings provision of the FOIA.[108] The FOIA includes express time limitations, which state, in part, the following:

> Any citizen may challenge the validity . . . of any action of a public body by filing suit within 60 days of the citizen's learning of such action but in no event later than 6 months after the date of the action.[109]

The Plaintiff filed his complaint on October 11, 2012, well beyond the FOIA's six-month statute of repose. Therefore, I find that the Plaintiff's failure to contest the

---

[104] Pl.'s Answering Br. 21.
[105] *Id.* at 21.
[106] *Id.* at 22.
[107] *Id.* at 70.
[108] *See* 29 *Del. C.* § 10004.
[109] *Id.* at § 10005(a).

alleged FOIA infractions within six months amounts to laches, by analogy to the statute of repose, and grant summary judgment in favor of the Defendants for the FOIA claims embedded in Count II.

In the Plaintiff's answering brief, he concedes that most of the FOIA claims alleged against the City are time-barred; however, the Plaintiff argues that he has properly alleged "FOIA claims that fall with[in] the six-month statutory period for filing a complaint," citing paragraphs 220 through 232 of his Complaint.[110] These paragraphs were not originally cited in Count IV of the Complaint, however. After reviewing the paragraphs identified in the Plaintiff's answering brief, it appears that he alleges FOIA violations resulting from various City meetings between June and September 2012.[111] However, the topics in the meetings were wholly unrelated to the Turbine,[112] and the Plaintiff has not sought relief for allegations related to these meetings, beyond a blanket request that I enter a declaratory judgment that the meetings were "illegal." But invoking the Declaratory Judgment Act,[113] without an actual controversy, does not confer jurisdiction on this Court.[114] An actual controversy involves redress of a disputed right on the part of the complainant, where the dispute is actual, ripe, and adverse between the parties.[115] As such, the Plaintiff

---

[110] Pl.'s Answering Br. 77.
[111] Compl. ¶ 220–32.
[112] *Id.* at ¶ 222.
[113] *See* 10 *Del. C*. §§ 6501–13.
[114] *E.g.*, *Rollins Int'l, Inc. v. Int'l Hydronics Corp.*, 303 A.2d 660, 662–63 (Del. 1973).
[115] *Id.*

has failed to state a claim with respect to violations of FOIA involving the 2012 meetings.

### E. Claims Against DNREC for Allowing Certain Persons to Hunt the Property

In Count V, the Plaintiff accuses DNREC of "allow[ing] selected individuals to hunt illegally on State-owned Open Space Park land." The Plaintiff concedes that DNREC has the authority to regulate hunting in State parks,[116] but argues that "the gravamen of this claim is that DNREC allowed only *select individuals* to hunt in this area."[117] According to the Plaintiff, "[i]f hunting is to be allowed in this area, all citizens should have the same rights."[118] However, the Plaintiff does not allege that he has sought and been denied a right to hunt these lands; he is a mere intermeddler who seeks a declaration without a corresponding interest or injury. He is without standing; therefore, I grant summary judgment in favor of the Defendants in Count V.[119]

---

[116] Pl.'s Answering Br. 56. Both the Plaintiff and DNREC cite 7 *Del. C.* § 4701(d), which provides:
> All state parks and other areas acquired primarily for recreational use shall, from the date of their establishment as such, come under the jurisdiction of the Department of Natural Resources and Environmental Control and shall be closed to hunting, except in areas designated by the Department of Natural Resources and Environmental Control for such purpose.

[117] Pl.'s Answering Br. 57 (emphasis added).

[118] *Id.* at 57.

[119] The Plaintiff alleges for the first time in his answering brief that this supposed illegal hunting occurs in close proximity to his residence and in an area through which he regularly walks, thus creating a hazard and a nuisance. *Id.* at 57. However, as the Plaintiff did not raise this allegation in his Complaint and points to no record evidence in support, I do not consider these allegations here.

*F. Tort Claims Against All Defendants*

In Counts VI and VII, the Plaintiff alleges eight tort claims: (1) private nuisance,[120] (2) negligent infliction of emotional distress, (3) public nuisance, (4) negligence per se, (5) negligence, (6) fraudulent misrepresentation, (7) negligent misrepresentation, and (8) civil conspiracy. The Plaintiff brings each tort claim against all of the Defendants "under the concert of action and civil conspiracy doctrines." I address each tort claim below.

### 1. Private Nuisance and Public Nuisance

A private nuisance is "a nontrespassory invasion of another's interest in the private use and enjoyment of land."[121] "[A]ll those who participate in creating the nuisance may be liable to third parties who suffer as a result."[122]

The Plaintiff alleges that the Turbine—one-half mile distant from his property—produces "disturbing noises, flashing red light, strobe/shadow effect and unreasonable interference with [his] use and enjoyment of his property, including sleep deprivation."[123] The Defendants argue that they could not have unreasonably

---

[120] The Plaintiff alleges that the effects of the Turbine have caused both a "private nuisance" and a "continuing private nuisance." The allegations largely overlap and there is no legal distinction between the Plaintiff's causes of action. Therefore, I will consider both sets of allegations under the private nuisance tort.

[121] Restatement (Second) of Torts § 821D (1979). *See also Bechrich Holdings, LLC v. Bishop*, 2005 WL 1413305, at *9 (Del. Ch. June 9, 2005) (citing *Cunningham v. Wilmington Ice Mfg. Co.*, 121 A. 654, 654 (Del. Super. 1923) (defining tort of private nuisance).

[122] *Leitstein v. Hirt*, 2006 WL 2986999, at *2 (Del. Ch. Oct. 12, 2006) (citing *Keeley v. Manor Park Apartments*, 99 A.2d 248, 250 (Del. Ch. 1953)).

[123] Compl. ¶ 278.

interfered with the Plaintiff's use and enjoyment of his property, pointing to affidavits filed in this matter, which embody studies that show that the Turbine "complies with the [S]tate's noise regulations;[124] that it complies with the City's noise and other zoning requirements;[125] and, that any 'flicker' is limited."[126]  The Plaintiff personally expresses disagreement with these studies,[127] but points to no evidence that he has been harmed by the Defendants' unreasonable acts.  During oral argument, the Plaintiff argued that it was subliminal long-waive-length sounds and the pernicious effects on health of the limited flicker effect that have caused him physical harm and diminished his property value.  These are claims that will require expert testimony to validate.[128]  Since the Defendants have submitted affidavits

---

[124] The University commissioned a noise study in late 2010 that concluded that even when the Turbine is moving at its maximum speed, it complies with Delaware Noise Regulations.  Defs. City/UD's Opening Br. 16; Aff. of Allison McCowan, Exs. C (Acoustic Study) and D (Sound Compliance Study).

[125] The City submitted the affidavit of the Building Official for the City, who stated that the Turbine does not violate the City's noise ordinance.  Aff. of Allison McCowan, Ex. A (Aff. of Henry Baynum), at ¶ 8.

[126] The University hired SED to perform a "Shadow Flicker Analysis."  SED concluded that the Turbine would not have any adverse shadow flicker impacts to the surrounding area.  *Id.* at Ex. B (Shadow Flicker Analysis).

[127] Compl. ¶ 35; Oral Arg. Tr. 58–60 (Unofficial Transcript).

[128] When the issue of causation requires consideration of scientific determinations that are not a matter of common knowledge, the plaintiff has the burden to provide testimony of a competent expert witness.  *See, e.g.*, *Money v. Manville Corp. Asbestos Disease Comp. Tr. Fund*, 596 A.2d 1372, 1377 (Del. 1991) ("The plaintiff has the burden of providing by competent evidence that there was a reasonable probability of a causal connection between each defendant's negligence and the plaintiff's injury . . . .  When the issue of causation is presented in a context which is not a matter of common knowledge, such a reasonable probability can only be proven by the testimony of a competent expert witness.") (internal citations omitted).  Here, the Plaintiff's nuisance claim requires many scientific determinations, such as the level of subliminal sound, the frequency of a flicker effect, and the effect of each on his health and property values, all of which are not a matter of common knowledge and thus require testimony of an expert.

indicating that the Plaintiff has suffered no cognizable harm, Rule 56 requires the Plaintiff to point to record evidence of his own showing an issue for trial, or his claims must be dismissed.[129] The Plaintiff can point to nothing in the evidence of record to substantiate his allegations.

At oral argument, the Plaintiff maintained that he had not understood it was necessary to provide evidence of harm at this stage of the litigation, but he represented to the Court that he could provide expert testimony to support his nuisance claim if given more time. I note that the Plaintiff is representing himself *pro se* in this matter and has made allegations that, if true, could lead to relief. Given these considerations, I find it equitable to give the Plaintiff the opportunity to submit expert testimony to support his private nuisance claim. Therefore, I will reserve my decision regarding the Plaintiff's private nuisance claim for 60 days, within which time the Plaintiff should submit affidavits and an expert report sufficient to sustain a finding of nuisance. If the Plaintiff fails to submit additional evidence, I will revisit the Defendants' Motion for Summary Judgment as to the private nuisance claim.

The Plaintiff also alleges the Turbine has caused a public nuisance. A public nuisance is a nuisance that "affects the rights to which every citizen is entitled."[130]

---

[129] *See* Ch. Ct. R. 56(e); *see also Winshall v. Viacom Intern. Inc.*, 2012 WL 6200271, at *8 (Del. Ch. Dec. 12, 2012).

[130] *Artesian Water Co. v. New Castle Cnty.*, 1983 WL 17986, at *22 (Del. Ch. Aug. 4, 1983). *See also* Restatement (Second) of Torts § 821B(1) (1979) ("A public nuisance is an unreasonable interference with a right common to the general public.").

To have standing to bring a public nuisance claim, a private plaintiff must allege a special harm—that is, a harm "of a kind different from that suffered by other members of the public."[131]

The Plaintiff's public nuisance claim suffers the same shortcoming as does his private nuisance claim: he has failed thus far to present any scientific evidence that links his complaints of special injury—physical and property damage—to the operation of the Turbine. Assuming he does so in the time I have allotted him, he will have met the requirement of special injury. The infringement of a public right he alleges is that the Turbine presents a safety hazard to the public using the Connector Road, an allegation that awaits factual development. For the reasons stated above, I reserve decision on the Defendants Motion for Summary Judgement with respect to the public nuisance claim for 60 days, during which time the Plaintiff may supplement the record with affidavits and an expert report.

### 2. Negligence *Per Se*

The Plaintiff alleges that the Defendants have damaged him, and are negligent *per se*. To establish negligence *per se*, a plaintiff must first demonstrate that the defendant committed a "violation of a Delaware statute enacted for the safety of

---

[131] *Artesian Water Co.*, 1983 WL 17986 at * 22. *See also* Restatement (Second) of Torts § 821C (1979) ("In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public . . . .").

others."[132]  Second, the plaintiff must demonstrate that the defendant's violation proximately caused his injury.

Here, the Plaintiff alleges that the Defendants violated the City's Comp Plan and the DLP Act by constructing the Turbine at its present location.[133]  The Plaintiff has not alleged that the DLP Act was "enacted for the safety of others,"—clearly, it was not—and therefore fails to establish negligence *per se*.  The Plaintiff's Complaint indicates that "[t]he City Code has Zoning regulations, the purpose of which are promoting public health, safety, morals, and general welfare of the City of Lewes";[134] but this is simply the general foundation upon which all statutes and regulations exist—a set of zoning regulations do not amount to regulation enacted expressly in aid of citizens' safety.  Finally, Plaintiff asserts that the UD Defendants "violated the State's Noise Statute and City's Noise Ordinance."[135]  Again, there is no indication that these ordinances were enacted to protect the safety of the public.  Summary judgement is therefore entered on the claims of negligence *per se*.

### 3. Negligence

The Plaintiff alleges that the Defendants were negligent in locating the Turbine.  To establish negligence, a plaintiff must show that the defendant owed the

---

[132] *Duphily v. Delaware Electric Co-Op, Inc.*, 622 A.2d 821, 828 (Del. 1995) (citations omitted).
[133] Pl.'s Answering Br. 81.
[134] Compl. ¶ 136.
[135] Pl.'s Answering Br. 81.

41

plaintiff a duty; that the defendant breached that duty; and that the defendant's breach proximately caused an injury to the plaintiff.[136]

The Plaintiff alleges that "UD owed a duty to Lechliter to locate and operate the Turbine with reasonable care because it knew, or should have known, the Turbine would affect residents whose homes are in close proximity to it with nuisance noise, flicker, and even vibration."[137] The Defendants argue that this duty equates to the general duty of an adjacent landowner—which is already accounted for in the Plaintiff's private nuisance claim—and that the Plaintiff must cite a separate duty on which to base his nuisance claim.[138] The Defendants fail to cite a legal basis for this assertion, however. I note that the Defendants have not asserted that the regulatory process by which they obtained a permit for the Turbine precludes this claim, and I do not consider that argument here.

The Plaintiff has alleged that UD owes the Plaintiff a duty of reasonable care to locate the Turbine so as to not damage neighboring property, which duty it breached, and that Plaintiff has suffered damages thereby. While the Defendants are correct that the Plaintiff may not recover damages for the same injuries under separate theories of nuisance and negligence, they are not entitled to summary judgment on this record. However, I reserve decision on these claims for the same

---

[136] *See Culver v. Bennett*, 588 A.2d 1094, 1096–97 (Del. 1991) (citations omitted).
[137] Compl. ¶ 65.
[138] Defs. City/UD's Reply 15.

reason as with the nuisance claims—the Plaintiff must in 60 days supplement the record to show injury, or face summary judgement.

Finally, in Count VII, the Plaintiff attempts to state another negligence claim: he asserts that by locating the Connector Road too close to the Turbine, DNREC and UD acted "with gross and wanton negligence" in creating "a public safety hazard for citizens by approving UD's realignment of the Connector Road."[139] The tort of negligence cannot address a prospective public injury, and the defendant has failed to point to (or even allege) any injury he has suffered due to the construction or location of the road. I grant the Defendants' Motion for Summary Judgment with respect to Count VII.

### 4. Fraudulent Misrepresentation

The Plaintiff asserts numerous claims of fraudulent misrepresentation. In order to establish a claim for fraudulent misrepresentation, a plaintiff must show: (1) that the defendant made a false representation of a material fact to the plaintiff; (2) that the defendant must have knowledge of the falsity of the representation, while the plaintiff must be ignorant of the falsity; (3) that the misrepresentation was made with the intent that the plaintiff would believe it to be true, act in reliance thereon, and be deceived thereby; and (4) that the plaintiff actually did so believe, act, and

---

[139] Compl. 68. The Connector Road was constructed after the Turbine was up and operating.

43

was deceived, as well as having been harmed thereby.[140]

The Plaintiff asserts that "UD never informed the public about any problems associated with Turbines," and, instead, presented the Turbine as "[g]reen [e]nergy, the wave of the future, and completely benign."[141] In addition, the Plaintiff alleges that UD "misrepresented the zoning for the parcel" on which the Turbine was constructed—apparently an allegation relating to the indication in the City-MOA that the property was zoned "University."[142] According to the Plaintiff, "[i]f the land use of 'Open Space' in the Comp Plan had been applied to the parcel, the Turbine never would have been built at this location without a public hearing."[143] Overall, the Plaintiff alleges that he relied on UD's misrepresentations of the zoning of the Encumbered Land and, as a result, he failed to oppose the Turbine prior to construction.[144] Moreover, had the Plaintiff known about the "problems associated with [t]urbines," he would have "taken action to prevent UD from building its Turbine."[145]

The Plaintiff has not, and cannot, allege that he was harmed by the misrepresentation of the Defendants, if any. His contention that he would have

---

[140] *See Brzoska v. Olson*, 668 A.2d 1355, 1366 (Del. 1995) (citing *Twin Coach Co. v. Chance Vought Aircraft, Inc.*, 163 A.2d 278, 284 (Del. 1960) (citations omitted)).
[141] Pl.'s Answering Br. 84 (quotations omitted).
[142] *Id.* at 85.
[143] *Id.* at 86.
[144] *Id.* at 87.
[145] *Id.*

44

"taken action" does not amount to an allegation that he could have blocked the construction of the Turbine, and he cannot, therefore, demonstrate that he has been harmed by any statements of UD. With respect to his claims that UD should have provided him additional negative information about wind turbines in general, the failure to inform without more is not actionable misrepresentation. In effect, the misrepresentation claims are merely an attempt to repackage his stale FOIA and process arguments. I grant the Defendants' Motion for Summary Judgment as to the Plaintiff's claim for fraudulent misrepresentation.

### 5. Negligent Misrepresentation

In the Plaintiff's Complaint, he asserts that he "meets the minimal requirements for this tort claim."[146] The Defendants correctly point out that the Plaintiff's claim must fail because he does not allege that the Defendants owed a "pecuniary duty" to provide accurate information to the Plaintiff—a necessary element of negligent misrepresentation.[147] Therefore, I grant the Motion for Summary Judgment in favor of the Defendants on this claim.

### 6. Civil Conspiracy

The Plaintiff's Complaint contains multiple allegations of conspiracy, all of which I address in this section. To state a claim for civil conspiracy under Delaware

---

[146] Compl. ¶ 307.
[147] *See Corp. Prop. Assocs. 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048, at *8 (Del. Ch. Apr. 10, 2008).

law, a plaintiff must plead facts supporting "(1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff."[148] In Count I of the Complaint, the Plaintiff alleges that

> Defendants DNREC, UD, Gamesa, Blue Hen, and First State conspired to build the Turbine illegally on state-owned Open Space in violation of the [DLP] Act at 7 *Del. C.* § 7501 et seq.; 29 *Del. C.*, chapter 94, "Real Property Disposition"; 30 *Del. C.* 5423(c)(2); and the Delaware Coastal Zone Act and Regulations.[149]

Similarly, in Count II of the Complaint, the Plaintiff alleges the following:

> The City and [UD Defendants] conspired to violate the City's October 2005 Comp Plan and 22 *Del. C.* § 702(d), to misrepresent material facts to the detriment of City taxpayers; to issue an illegal Building Permit; [and] to defraud the City treasury of funds it is due by law.[150]

As the result of my decision above, none of the Plaintiff's individual allegations in Count I or II survive. Therefore, the Plaintiff's related conspiracy claims must fail because the Plaintiff has not alleged a surviving

---

[148] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1036 (Del. Ch. Nov. 22, 2006) (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149–50 (Del. 1987)).

[149] Compl. 56. The Plaintiff simplified this claim in his answering brief by alleging that "UD conspired with State and City officials to allow the construction of the Turbine in violation of the [DLP] Act." Pl.'s Answering Br. 92.

[150] Compl. 58. The Plaintiff simplified this claim in his answering brief by alleging that "UD conspired with State and City officials to allow the construction of the Turbine in violation of . . . the City's Comp. Plan . . . . The claim also applies to the City and UD's handling of the Building Permit." Pl.'s Answering Br. 92.

substantive cause of action on which to base his claims.[151]

Finally, in Count IV of the Complaint, the Plaintiff asserts that his "claim of fraud readily meets the requirement for an underlying wrong." It is unclear whether the Plaintiff alleges a fraud in relation to his allegations in Counts I and II, or if he alleges a separate count for fraud. I have already rejected the Plaintiff's allegations in Counts I and II, and to the extent the Plaintiff attempts to rely on a separate allegation of fraud, he has failed to state a claim for fraud with particularity.[152] Therefore, I grant summary judgment in favor of the Defendants as to all of the Plaintiff's conspiracy claims.

## V. CONCLUSION

The Complaint pleads tort claims that will require expert testimony to withstand summary judgment, barnacled with improperly alleged or stale process claims. Based on the foregoing, I grant summary judgment in favor of the Defendants on all of the Plaintiff's claims, except for certain of the Plaintiff's tort claims alleged in Count VI, upon which I reserve decision pending the Plaintiff's submission of expert opinion. The Defendants should present an appropriate form of order.

---

[151] The Plaintiff concedes that "it is essential that there be an underlying wrongful act, such as a tort or a statutory violation." *Id.* (citing *Empire Fin. Serv., Inc. v. Bank of New York (Delaware)*, 900 A.2d 92, 97 (Del. 2006)).

[152] *See Metro Commc'ns Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 144 (Del. Ch. 2004) (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)) (noting that Chancery Court Rule 9(b) requires that a claim of common law fraud be alleged with particularity).